Walter C. DUMAS

v.

Dave C. TREEN, Governor of State
of Louisiana.

Civ. A. No. 80–596–A.

United States District Court,
M.D. Louisiana.

Feb. 18, 1981.

Norman L. Haymer, Jr., T. Kenneth El-
bert, Baton Rouge, La., for plaintiff.

Carmack M. Blackmon, Baton Rouge, La.,
for defendant.

## OPINION ON MOTION FOR PRELIMINARY INJUNCTION

JOHN V. PARKER, Chief Judge.

Plaintiff, a former member of the Board of Supervisors of Southern University and Agricultural and Mechanical College, sues the Governor of Louisiana for allegedly violating his rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983. Plaintiff seeks declaratory judgment as well as injunctive relief. The matter was heard on plaintiff's motion for preliminary injunction, the Court having previously denied defendant's motion to dismiss and, alternatively, for stay of proceedings pending resolution of related state court litigation. The Court also denied plaintiff's motion for judgment on the pleadings.

Basically, plaintiff alleges that he was appointed by former Louisiana Governor Edwin Edwards to the Southern Board in 1975; that he was confirmed by the State Senate; that his term expired on December 31, 1978; that under Louisiana law he continued in office because no successor had been appointed; that on January 28, 1980, former Governor Edwards reappointed plaintiff to the Board for a term of six years; that defendant, Dave Treen, became Governor of Louisiana on March 10, 1980; that the Louisiana Legislature met in Regular Session from April 21, 1980, through July 14, 1980; that Governor Treen "deliberately and for political reasons" failed to submit plaintiff's name to the State Senate for confirmation as a member of the Southern Board; and that on September 17, 1980, Governor Treen appointed another person

to the Board. As background plaintiff alleges that he was very active in the gubernatorial campaign of Mr. Louis Lambert, whom Governor Treen defeated in a "runoff" election on November 8, 1979; that subsequent to the election Treen "stated on several occasions that he would have plaintiff removed from" the Southern Board. Plaintiff claims that these actions infringe upon his constitutional rights of freedom of speech by depriving him, for political reasons, of public employment which he had a reasonable expectation of retaining, as those rights are enunciated by the Supreme Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and their progeny. Plaintiff prays that the Governor be preliminarily restrained from removing or replacing him upon the Southern Board pending trial upon the merits of the action.

The following facts are established and are essentially undisputed. The 1974 Louisiana Constitution revised Louisiana's system of higher education and, among other changes, created the Board of Supervisors of Southern University. On January 1, 1975, plaintiff was appointed to the Southern Board by former Governor Edwards and plaintiff was confirmed by the Louisiana Senate on January 27, 1975, and executed his oath of office on the same date. Plaintiff's term expired on December 31, 1978, and he continued in office by operation of law. On November 8, 1979, defendant Treen was elected Governor of Louisiana but he did not take office until March 10, 1980, upon the expiration of Governor Edwards' term. On January 28, 1980, former Governor Edwards requested that the Secretary of State issue a commission to plaintiff as a member of the Southern Board. The appointment letter makes no reference to any specific term. Plaintiff executed his oath of office on February 15, 1980. Governor Treen did not submit plaintiff's name to the Louisiana Senate for confirmation during the Regular Session of 1980 and did not submit his name during any Special Session called after the Regular Session of 1980. On September 17, 1980,

Governor Treen appointed Horatio C. Thompson to the Southern Board "Vice Walter Dumas (Term Expires 12/31/84)." At the same time and in the same document the Governor appointed Dr. Ralph Thayer to the Southern Board "Vice Jimmy Thomas, Jr. (Term Expires 12/31/82)." Mr. Thompson executed his oath of office on September 25, 1980, and entered upon the execution of that office. This suit was filed on October 2, 1980.

Under the Louisiana Constitution, the Governor, as the Chief Executive Officer, is granted broad powers of appointment. Article 4, Section 5(H)(2), requires, as to appointments which must be confirmed by the Senate, that the Governor must submit the name of the appointee within forty-eight hours "should the Legislature be in Regular Session." That subsection further provides that "[f]ailure of the Senate to confirm the appointment, prior to the end of the session, shall constitute rejection."

Subsection (3) provides that if the Legislature is not in Regular Session the Governor may make interim appointments, "which shall expire at the end of the next regular session, unless submitted to and confirmed by the Senate during that session." Subsection (4) prohibits any person not confirmed by the Senate from being appointed to the same office during any recess of the Legislature.

The Southern Board and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College are both created by Article 8, Section 7, of the 1974 Constitution; and subject to the powers of the Board of Regents, "each shall supervise and manage the institutions, state wide agricultural programs and other programs administered through its system." The Board of Regents is created by Article 8, Section 5, and its duties are to "plan, coordinate and have budgetary responsibility for all public higher education." The primary function of the Board of Regents is to formulate and make revisions in the master plan for higher education, particularly as related to creation, extension, modification or termination of degree programs, and

it conducts studies regarding the needs for new higher educational institutions in the state. Actual operation of the Southern University system is the function of the Board, as is actual preparation of an annual operating budget which is submitted to the Legislature, through the Board of Regents.

The Southern Board is composed of seventeen members, two from each congressional district and one at large, all appointed by the Governor "with consent of the Senate," and the members are to serve overlapping six-year terms (Article 8, Section 7[B]).

Membership upon the Board of Southern University is not "employment" per se; it is a constitutional office of the State created by the State Constitution and subject to confirmation by the State Senate. Under Article 8, Section 8(C), members of the Board serve without pay but are paid per diem and expenses for attendance at Board and committee meetings.

It is clear that plaintiff's 1980 appointment to the Southern Board by former Governor Edwards was an interim appointment within the meaning of Article 4, Section 5(H)(3), of the Louisiana Constitution and that, since his name was not "submitted to and confirmed by the Senate" during the Regular Session of 1980, his interim appointment expired on July 14, 1980, the last day of the legislative session.

Plaintiff's claim is unique in at least two respects: First, he is claiming deprivation of an office created by the Constitution and subject to confirmation by the Senate, and one which has no regular hours or pay; secondly, plaintiff does not complain of any actual measures taken affirmatively against him but he complains of Governor Treen's inaction in not submitting his name for consideration to the Senate, thus allowing his interim appointment to expire by operation of law. Plaintiff concedes that had his name been submitted to the Senate and had that body, for whatever reason, declined to confirm his appointment, he would have no grounds for complaint.

From the outset, the Court has entertained serious doubts that a constitutionally created office which requires Senate confirmation is the type of "public employment" that can be brought within the *Elrod-Branti* rule. Nevertheless, because of plaintiff's insistence that Governor Treen "removed" him from office because of his 1979 political activities on behalf of the Governor's political adversary, we allowed him to present his evidence. During the 1979 campaign, plaintiff, a black[1] lawyer who practices in Baton Rouge, worked as a Lambert coordinator among black voters in a nine-parish area in north Louisiana. That service is the predicate for plaintiff's claim of political discrimination.[2] In essence, plaintiff claims that Governor Treen is attempting to punish him because of his political activities, and these are, of course, protected by the First Amendment. Plaintiff has, however, failed to prove that he personally has been singled out for political retribution. There is no doubt that plaintiff was a campaign worker and leader in the Lambert campaign. However, neither Governor Treen nor any of his top aides could recollect ever having heard of plaintiff prior to the institution of this litigation. It was established that plaintiff's name was on a list of persons holding interim appointments from Governor Edwards but all denied recognizing plaintiff's name or knowing anything about his activities. All of Treen's top aides denied ever having discussed or considered plaintiff's position on the Southern Board, and none were aware of plaintiff's political activities on behalf of Lambert.

1. Plaintiff does not here claim any racial discriminatory motives since it is undisputed that Mr. Thompson, whom Governor Treen appointed in plaintiff's place, is also a black man.

2. Although Governor Treen is a Republican (the first elected Governor of Louisiana in 100 years) and plaintiff is a Democrat, party affiliation is not significant in this case. The Court judicially notices that there are so few registered Republicans in Louisiana that in order to win, it was necessary that Treen receive a majority of Democratic as well as Republican votes; moreover, his administration is studded with Democrats in important public positions. Finally, the evidence shows that Mr. Thompson, who replaced plaintiff, is, like plaintiff, a Democrat.

Mr. Nicholas Estiverne, who described himself as a "field worker" for the Treen campaign, did testify that he knew plaintiff prior to the campaign and knew that plaintiff served on the Southern Board, but he denied being aware that plaintiff was active in the Lambert campaign until after plaintiff's suit was filed. He further denied discussing plaintiff's position on the Southern Board with any of the top people in the Treen campaign or administration, and Governor Treen testified that Estiverne did not rank sufficiently high in either the campaign or the administration to be included in discussions regarding appointments. Plaintiff did establish that the Treen people compiled one or more lists of vacancies and expected vacancies on the various State boards and commissions to which the Governor has appointing powers, including, as noted above, the Southern Board, but there is nothing sinister nor ominous in that activity. That is simply a sound procedure for an incoming administration in determining which vacancies the Governor will have to fill.

Plaintiff's name and the fact that he held an interim appointment were no doubt noted on those lists, but there is no evidence to support the claim that plaintiff's name was recognized by or was familiar to any of the persons involved in actually deciding on appointments; nor is there any evidence to support plaintiff's allegations that Governor Treen, on several occasions, declared that he intended to remove plaintiff from the Southern Board. The evidence convinces the Court that, prior to this litigation, the plaintiff was simply unknown to Governor Treen and his top aides.

Plaintiff has failed to establish the slightest degree of personal animosity which is the predicate of his complaint. Plaintiff has shown, arguably however, that he might have been passed over for reappointment to the Southern Board because the Treen administration wanted to make room for appointments of its own supporters. John C. Cade, who served as Treen campaign chairman, who since the election has been appointed by the Governor to the Louisiana State University Board and who now serves as an unpaid patronage adviser to the Governor, testified that soon after the election the Governor's counsel advised him that the names of persons holding interim appointments to constitutional offices were not required to be submitted to the Senate and that after the regular session of the Legislature all such offices would be vacant. Cade testified that, while no requests were made that such persons resign, an informal policy was established that the Treen administration would not submit the names of any persons holding interim appointments from Governor Edwards to the Senate for confirmation unless a specific recommendation for doing so was submitted by a member of the Legislature or by a friend of the Treen administration. Cade also testified that no attempt was made to identify former Lambert supporters, per se; in Cade's view the election was over and he wanted to encourage former Lambert supporters to become new Treen supporters. Cade also said that most persons holding interim appointments from the Edwards administration requested that they be reappointed to full terms and that all such requests were considered. He testified that the criterion was not prior political support but qualifications for the office and compatibility with the views of the administration.

Mr. Edgar G. Mouton, Jr., Executive Counsel to the Governor (a Democrat who was eliminated in the primary for Governor in 1979), also indicated that the administration wanted to appoint people to boards and commissions who would reflect a philosophy of government similar to Treen's. Cade testified that some persons holding interim appointments from former Governor Edwards were reappointed—he could recall two members of the State Mineral Board in that category—and that neither plaintiff nor anyone else ever requested that plaintiff be reappointed to the Southern Board.

In *Branti*, the Supreme Court clearly indicated that a requirement that an employee of a prior administration receive a recommendation from a member of the winning team in order to continue his appoint-

ment was beyond the constitutional power of government. It should be noted that *Elrod* dealt with persons who were employed as full-time deputy sheriffs and *Branti* dealt with persons who were employed as full-time assistant public defenders. *Branti* indicates that any requirement for politically compatible views must be justified by the government:

"Both opinions in *Elrod* recognize that party affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." (100 S.Ct. at 1294)

As noted above, party affiliation, as such, is not at issue here. Formal political parties, however, are not the gravamen of the *Elrod-Branti* cases; winning factions are every bit as much "parties" as are formalized organizations.

Here, we must reach and resolve the issue which the Fifth Circuit avoided in *Tanner v. McCall*, 625 F.2d 1183 (5th Cir.1980). There, the Court dealt with a newly elected Florida sheriff. The claim was made that deputies were being retained or let go based on their political activity for or against the winning sheriff. The Court noted that under Florida law a deputy is the sheriff's alter ego and that the sheriff is civilly liable for the actions of the deputy, and by statute the appointment of a deputy sheriff ends when the sheriff's term ends. The Court concluded that the plaintiff there had not actually proved any political activity discrimination by the new sheriff; on the contrary, it was established to the Court's satisfaction that the new sheriff was choosing deputies based on qualifications and capabilities other than political activity. Accordingly, the Court declined to determine whether party affiliation could be required of deputies under the peculiarities of Florida law.

*Branti* abolished any notion that because a political official holds a "policy-making" job, he is without the constitutional protection of the First Amendment. As the Court noted:

"... On the other hand, it is equally clear that the governor of a state may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." (100 S.Ct. at 1295)

It is clear here that a member of the Board of Supervisors of Southern University is not a "confidential" assistant to the Governor, and it is also clear that the Governor does not, on a day-by-day basis, control his activities nor even his votes as a member of that body. On the other hand, and although not noted in *Branti*, it takes more than speech writers, press secretaries and legislative lobbyists to administer a state. Governor Treen was elected to office espousing a rather well defined and publicized political philosophy covering a wide range of governmental activities, including education. That philosophy contrasted, in some ways, with the philosophy advocated by the prior administration.

The Court concludes that the Governor of Louisiana has the constitutional right to require "party affiliation," at least to the extent of compatible governmental philosophy, of any appointee to a constitutionally created board or commission which requires confirmation by the Senate. Any such appointee is a high-ranking and influential member of the government. Any such position is purely political in the sense that unless the nominee receives Senate confirmation, he cannot serve and there are no

restraints upon the members of the Senate in their consideration. The Senate may refuse to confirm him for any reason, including political activity, or for no reason. It would certainly be illogical, at least, to strip the politics from the gubernatorial selection process but leave it intact in the legislative confirmation process. Judicial power, even federal judicial power, does not extend to mandating the votes of a member of a state legislature. Thus, the only way to remove Southern Board appointments from the political arena of the State Senate is to eliminate the requirement for Senate approval. In order to accomplish that, it would be necessary to rewrite the 1974 Louisiana Constitution. The people of Louisiana, by ratifying the 1974 Constitution, have indicated that they want their Governor to be unrestrained and unfettered in his choice of appointees to the Southern Board. Louisianians have that power.

■ Assuming, for purposes of argument, that plaintiff has established that a "political loyalty" requirement has been imposed on him in this case, the Court concludes that the overriding interests of the State justify and authorize such a requirement. Plaintiff will be unlikely to win this case upon trial on the merits.

This matter is before the Court on a motion for preliminary injunction, and traditionally, plaintiff must meet four standards in order to show that he is entitled to injunctive relief. *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974). The standards are:

(1) Irreparable injury because of the unavailability of an adequate remedy at law,

(2) A substantial likelihood of plaintiff's success upon trial on the merits,

(3) The threatened injury to plaintiff outweighs any possible harm to the defendants, and

(4) The preliminary injunction will not disserve the public interest.

Here, it is well established that any injury to constitutionally protected First Amendment rights is irreparable. *Elrod v.*

*Burns, supra; Branti v. Finkel, supra.* On the other hand, we have just commented that plaintiff is unlikely to be successful on the trial of this case on the merits. We comment further that plaintiff's threatened injury does not outweigh possible harm to the defendant because forcing the defendant to name plaintiff to the Southern University Board of Supervisors in violation of State law could well interfere with governmental operations.

As previously noted, plaintiff did not commence this litigation until after Mr. Thompson, who succeeded him, had been appointed and taken the oath of office. From that moment on, plaintiff was no longer a member of the Southern Board. Although he couches his prayer in terms of restraining the defendant from "removing him" from his position, the actual fact is that plaintiff was not a member of the Southern Board at the time he commenced this action. Accordingly, what he actually wants is a preliminary injunction, not to maintain the status quo, but to restore him to his former position. Such an injunction would of necessity, be a mandatory injunction, setting aside Mr. Thompson's appointment and directing the Governor to name plaintiff in violation of the provisions of Article 4, Section 5(H)(4), of the Louisiana Constitution which prohibit a person not confirmed by the Senate from being named to the same office during a recess of the Legislature. Under these circumstances, a preliminary injunction would be of disservice to the public interest.

Moreover, there is a long line of authorities to the effect that equity in the form of a preliminary injunction is a preventive remedy and that it affords relief against *future acts* which are threatened or apprehended in order to preserve the status quo, as opposed to restoring a previous condition. *Exhibitors Post Exchange, Inc. v. National Screen Service Corporation,* 441 F.2d 560 (5th Cir.1971).

For all of the foregoing reasons, plaintiff is not likely to be successful upon the trial on the merits of this action. Accordingly, plaintiff's motion for preliminary injunction is DENIED.